**IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
FAYETTEVILLE DIVISION**

**KATHRINA ALEXANDER**                                                                          **PLAINTIFF**

**V.**                                            **CASE NO. 5:23-CV-5193**

**MAURA CATANO and
DOES 1 to 100, Inclusive**                                                                     **DEFENDANT(S)**

**MEMORANDUM OPINION AND ORDER**

Now before the Court is Defendants' Motion for Summary Judgment (Doc. 36). The Motion is fully briefed and is ready for the Court's review. Plaintiff Kathrina Alexander, a female doctor, brought this case alleging that her employer, the United States Department of Veterans Affairs ("VA"), violated Title VII, the Equal Pay Act ("EPA"), and the Whistleblower Protection Act ("WPA") during her tenure at the Veterans Health Care System of the Ozarks from September 2019 to September 2021. For the reasons discussed below, the Court **GRANTS IN PART AND DENIES IN PART** Defendants' Motion for Summary Judgment.

**I.    BACKGROUND**

Alexander was employed as Chief of Pathology and Laboratory Medicine Service at the Veteran's Health Care System of the Ozarks in Fayetteville, Arkansas from September 2019 until her medical retirement in September 2021. (Doc. 39-9, ¶¶ 1, 2, 14). Most of Alexander's complaints center around the Chief of Staff, Dr. Anurag Mehta, who served as her first-line supervisor, and the facility director, Kelvin Parks, who served as her second-line supervisor. (Doc. 39-9, ¶ 4). Alexander states in her declaration that on April 23, 2020, she filed a complaint with the Equal Employment Opportunity Commission ("EEOC") against Mehta alleging hostility, harassment, and inappropriate workplace

1

behavior that made her "anxious and uncomfortable" and "propos[ing]" that such behavior was "motivated by gender and racial prejudice." (Doc. 39-8, ¶ 6). Alexander also filed an EEO complaint with the VA in January 2021 that alleged sex discrimination and reprisal for protected EEO conduct. *See* Doc. 39-2 (complaint); Doc. 39-1 (Alexander's testimony in the VA's EEO investigation, laying out what charges were accepted for investigation).

Unfortunately, the parties have not established the clearest timeline of the alleged discriminatory and retaliatory acts. According to Alexander's declaration, Mehta excluded her from serving in the rotation for Acting Chief of Staff in his absence—a key leadership position for career advancement—despite allowing all other chiefs to serve in this role. (Doc. 39-8, ¶ 10). The Court notes that at least four of the other chiefs allowed on this rotation were women. (Doc. 39-1, p. 25). The exclusion from this rotation appears to have been an ongoing issue.

From approximately March 2020 to September 2020, Alexander was tasked with running a mobile phlebotomy lab. (Doc. 39-8, ¶ 9). According to Alexander's declaration, Parks and Mehta failed to provide the required logistical support and, effectively, thwarted the lab's success. *Id.* In June of that year, Alexander was excluded from a meeting regarding this lab. *See* Doc. 39-1, p. 23 (listing those who were in attendance—five out of seven were women). Alexander testified that she notified the Office of Inspector General around June or July 2020 regarding concerns for patient safety within the lab, and the lab was ultimately decommissioned. (Doc. 39-8, ¶ 9). Alexander believes that Parks and Mehta set her up to fail. *Id.*

Also in June 2020, Alexander was removed from a panel that was organized to hire a new Chief of Internal Medicine. (Doc. 39-8, ¶ 11). The parties dispute what

occurred, but viewing the evidence in the light most favorable to Alexander, on June 3 at approximately 7:30 AM, she received an email from an administrative officer inviting her and another Chief of Staff to serve on the panel; Mehta was cc'd on that email. (Doc. 39-6, p. 3). Less than one hour later, Mehta's assistant emailed the administrative officer with updated interview information, including a list of chiefs to be on the panel that now omitted Alexander. *Id.* When the administrative officer asked Mehta's assistant why the panel members were being changed, the assistant responded, "That is what the Chief of Staff [Mehta] wants." *Id.* The administrative officer testified in the EEO proceedings that he did not believe Alexander should have been removed from the panel because she was a chief of department and that is who he was asked to previously include on similar interview panels. *Id.* at p. 4.

Alexander states in her declaration that approximately one week later, on June 11, 2020, Mehta sexually harassed her. According to Alexander, Mehta had been invading her personal space and standing too closely to her starting in April of that year. (Doc. 39-8, ¶ 5). But in June, it escalated to unwanted touching. Per Alexander's declaration, Mehta called her in for a meeting and sent the two people accompanying her away, so that Alexander and Mehta were alone. *Id.* Alexander testified that, as she sat in a chair near the door, Mehta "insisted upon standing over [her] to write on the white board over [her] head, which [she] could not even see" because she was sitting in the chair. *Id.* Per Alexander's account, Mehta "stood so close, hovering over [her], that his leg rubbed against [her] thigh," and he "kept leaning over [her] to write on the white board and purposefully rubbed his leg against [her] thigh each time." *Id.*

Also at some point in June, Alexander engaged in a mediation regarding her April 23 EEOC complaint, according to her declaration. (Doc. 39-8, ¶ 6). An agreement was reached requiring a new reporting structure. *Id.* Alexander states that Parks failed to implement this change until she filed a complaint with the Office of Special Counsel. *Id.* This was not the only time Parks failed to address Alexander's complaints; Alexander also generally states that Parks failed to take action when, on multiple occasions, she reported that she was being "bullied, harassed, and given illegal and unethical directives that violated [her] employee's rights and VA policies." (Doc. 39-8, ¶ 8).

Another primary point of contention is whether Alexander's annual evaluation—completed by Mehta—was delayed and whether it was unjustifiably negative. It is undisputed that Alexander received her evaluation in October 2020 and that the evaluation gave her an "Unsatisfactory" rating in professionalism, citing "Validated Disruptive or Unprofessional Behavior." (Doc. 39-7, p. 2). According to Alexander, her evaluation was due several months earlier, but Mehta had refused to complete the evaluation or meet with her to discuss the delay. (Doc. 39-8, ¶ 12). Alexander also explains in her declaration that, despite the evaluation noting "2 reports of unprofessional and insubordinate behavior," her personnel file was free from any disciplinary actions, advising, or adverse events, and Mehta was only able to produce three emails showing mere differences in opinion and communication problems in support of the "Unsatisfactory" rating. (Doc. 39-8, ¶ 14).

Alexander stated in her declaration that such a rating "placed [her] position at VHSO at risk and was potentially damaging to [her] future career" because such evaluations are "instrumental in a physician's credentialing, licensing, and promotion."

4

(Doc. 39-8, ¶ 15). According to her declaration, the delayed evaluation also delayed her eligibility for raises, promotions, and bonuses. *Id.* at ¶ 12. There is evidence in the record that the VA uses performance evaluations "in making determinations on promotions, reductions-in-force, within-grade increases for GS, FWS and hybrid employees, training, and adverse actions based on poor performance." (Doc. 39-4, p. 1). Though the evidence shows a delayed evaluation *could potentially* jeopardize Alexander's ability to obtain raises or promotions, there is no evidence that it actually prevented her from receiving a particular bonus or promotion. In fact, Alexander concedes that she received a discretionary $14,850 bonus in performance pay in December 2020 at Mehta's recommendation. (Doc. 39-9, ¶ 7).

Additionally, according to Alexander, Mehta limited her ability to telework at the height of the COVID-19 pandemic. (Doc. 39-8, ¶ 22). In her EEO testimony, Alexander explained that Mehta refused to provide her with the necessary supplies for her to telework (though he and others regularly teleworked, *see* Doc. 39-1, p. 42). Alexander explains in her EEO testimony that this lack of support resulted in her having to go in person to the hospital to use equipment to make a time-sensitive diagnosis; it was during this visit that she contracted COVID requiring her to be hospitalized in critical care for approximately ten days. (Doc. 39-1, p. 41)

There is also evidence that in April 2020, Alexander reported issues with, what was termed, the "Lookback" Project to the Office of the Inspector General ("OIG"). (Doc. 39-8, ¶¶ 16–17). According to Alexander's declaration, she was tasked with review of the prior Chief of Pathology's diagnoses after he was convicted and sentenced by this Court for involuntary manslaughter and mail fraud, *see United States v. Levy*, No. 5:19-CR-

50059-TLB (W.D. Ark.), but there were various missing documents that made it impossible for her to complete her review of the cases. (Doc. 39-8, ¶¶ 16–17).

In her First Amended Complaint and briefing, Alexander asserts that in November 2021, two months after her medical retirement, she learned that the VA had offered a male doctor a position as a staff pathologist for $500,000—nearly twice Alexander's salary as Chief of Pathology. (Doc. 11, ¶ 65; Doc. 39, p. 6). However, Alexander admits in her response to Defendants' Statement of Facts that the male doctor was, in fact, only offered $282,000, which was approximately $5,000–$6,000 *less* than what Alexander made in 2021. (Doc. 39-9, ¶¶ 10, 11). Alexander also concedes that the male doctor was not ultimately hired, and the VA instead hired a female doctor who was offered the same $282,000. *Id.* at ¶ 13.

Alexander asserts that in January 2022, several months after her retirement, she was passed over for a new position as Associate Chief of Staff for Ancillary Services despite having expressed an interest in the position. *Id.* at ¶ 15. She concedes, however, that this position was ultimately never created. *Id.* Nevertheless, Alexander alleges that not being selected for this position was in retaliation for her reporting what she thought was an EPA violation (her belief that the male doctor had been offered more than her salary for a subordinate position). Somewhat confusingly, she alleges in her FAC that she made the report in September 2022—nine months *after* the alleged retaliation for that report. *See* Doc. 11, ¶ 75.[1]

---

[1] Alexander's briefing states, "After Plaintiff learned of and complained about a potential violation of the equal pay act, she was passed over for a job opportunity she had previously expressed interest in." (Doc. 39, p. 7). But Alexander cites no evidence to support her making the EPA report, nor does she make any mention of it in her statement of facts.

Alexander filed suit in August 2023 in the Central District of California, and she filed her First Amended Complaint ("FAC") (Doc. 11) in October 2023. She brings claims under Title VII, the EPA, and the WPA. In November 2023, the parties jointly stipulated to transfer the case to the Western District of Arkansas. (Doc. 14). Defendants moved for summary judgment on all claims on March 28, 2025, and the Motion became ripe on April 18, 2025.

## II.  LEGAL STANDARD

Under Federal Rule of Civil Procedure 56(a), "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." The Court must review the facts in the light most favorable to the opposing party and give that party the benefit of any inferences that logically can be drawn from those facts. *Canada v. Union Elec. Co.*, 135 F.3d 1211, 1212–13 (8th Cir. 1997). The moving party bears the burden of proving the absence of a genuine dispute of material fact and that it is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(c); *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986); *Nat'l Bank of Com. of El Dorado v. Dow Chem. Co.*, 165 F.3d 602 (8th Cir. 1999).

Once the moving party has met its burden, the non-moving party must "come forward with 'specific facts showing that there is a genuine issue for trial.'" *Matsushita*, 475 U.S. at 587 (quoting Fed. R. Civ. P. 56(c)). "[T]he mere existence of a scintilla of evidence in support of the [moving party's] position will be insufficient" to survive summary judgment. *Anderson v. Durham D&M, L.L.C.*, 606 F.3d 513, 518 (8th Cir. 2010) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986)). Rather, for there to be a

genuine issue of material fact that would preclude summary judgment, the non-moving party must produce evidence "such that a reasonable jury could return a verdict for the nonmoving party." *Allison v. Flexway Trucking, Inc.*, 28 F.3d 64, 66 (8th Cir. 1994) (quoting *Liberty Lobby*, 477 U.S. at 248).

## III. DISCUSSION

### A. Title VII

Count One of the FAC brings a claim for violation of Title VII. The parties' briefing discusses discrimination under theories of disparate treatment and hostile work environment, as well as retaliation for EEO activity. The Court addresses each in turn.

#### *1. Sex Discrimination*

Under Title VII, it is unlawful for an employer "to discriminate against any individual with respect to [her] compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin.'" 42 U.S.C. § 2000e-2(a)(1). Where there is no direct evidence of discrimination, as is the case here, courts apply the *McDonnell Douglas* burden shifting framework to determine whether there is a claim for sex discrimination under Title VII. *Parker v. U.S. Dep't of Agric.*, 129 F.4th 1104, 1111 (8th Cir. 2025) (citations and quotation marks omitted).

i. Disparate Treatment

Under *McDonnell Douglas*, the plaintiff carries the initial burden of making out a prima facie case, which requires showing that she: (1) is a member of a protected class; (2) was meeting the legitimate expectations of her employer; and (3) suffered an adverse employment action; (4) under circumstances giving rise to an inference of discrimination. *Parker*, 129 F.4th at 1111 (citation omitted). If a plaintiff establishes a prima facie case,

8

the burden shifts to the defendant. *Id.* at 1112. Because the Court finds that Alexander has failed to make out a prima facie case for disparate treatment, the burden does not shift to Defendants, and this theory fails as a matter of law.

Here, Alexander asserts she "was subjected to repeated humiliation, such as being talked down to or demeaned in front of her peers, unwanted touching from her male supervisor, exclusion from key departmental meetings, exclusion from being on rotation as Acting Chief of Staff, and performance downgrades without justification, all of which reduced her professional development and advancement opportunities." (Doc. 39, p. 3). The actions that are conceivably based on sex—e.g., unwanted touching from a male supervisor—are better assessed under a hostile work environment theory, which the Court does *infra*. *See* subsection III(A)(1)(ii). As for the other actions, even assuming *arguendo* they were sufficiently adverse,[2] the circumstances do not give rise to an inference of discrimination.

For example, Alexander does not cite any evidence that Mehta talking down to her in front of her peers, giving her a performance downgrade,[3] or removing her from the

---

[2] "To make out a Title VII discrimination claim, a[n employee] must show some harm respecting an identifiable term or condition of employment." *Muldrow v. City of St. Louis*, 601 U.S. 346, 354–55 (2024). "What the [employee] does not have to show, according to the relevant text, is that the harm incurred was 'significant.'" *Id.* at 355. This differs from the standard for retaliation. *Id.* at 357.

[3] Alexander cites a declaration from Dr. Clayton Lawrence in support of the performance downgrades constituting an adverse action. In their Reply, Defendants note that Alexander did not identify Dr. Lawrence as a potential witness in her initial disclosures, supplement her disclosures, or provide any other notice of Dr. Lawrence as a witness. Doc. 40, p. 2; *see* Doc. 40-1 (Alexander's Initial Disclosures). Alexander did not respond to the issues Defendants raised regarding Dr. Lawrence's declaration. Accordingly, the Court will strike Dr. Lawrence's declaration at Doc. 39-3 under Federal Rule of Civil Procedure 37(c)(1) and this Court's Case Management Order (Doc. 31, ¶ 5).

hiring panel was at all connected to her sex. And as for being excluded from departmental meetings and from rotation as Acting Chief of Staff, the evidence shows that multiple women were included in each of these. *See* Doc. 39-1, p. 23 (listing the attendees at the June 2020 meeting regarding the phlebotomy lab: five out of seven were women); *id.* at p. 25 (listing those included in the rotation for Acting Chief of Staff, four of whom were women). As the Seventh Circuit has observed, "[j]udges are not like pigs, hunting for truffles buried in briefs," *United States v. Dunkel*, 927 F.2d 955, 956 (7th Cir. 1991) (per curiam)—the same is true of a district court's review of the record on summary judgment. *See Ragas v. Tenn. Gas Pipeline Co.,* 136 F.3d 455, 458 (5th Cir. 1998) ("Rule 56 does not impose upon the district court a duty to sift through the record in search of evidence to support a party's opposition to summary judgment." (internal citation and quotation marks omitted)). "Without the necessary indicia or any proof that [Defendants] adversely acted against [Alexander] based on her . . . gender, [her] disparate treatment claim[ ] fail[s] as a matter of law." *Parker*, 129 F.4th at 1112 (citation omitted).

ii.  Hostile Work Environment

"Title VII prohibits sexual harassment that takes the form of a hostile work environment." *Hairston v. Wormuth*, 6 F.4th 834, 841 (8th Cir. 2021) (citation omitted). To establish a hostile work environment claim, a plaintiff must show that: "(1) she is a member of the class of people protected by Title VII, (2) she was subject to unwelcome harassment, (3) the harassment resulted from her membership in the protected class,

and (4) the harassment was severe enough to affect the terms, conditions, or privileges of her employment." *Parker*, 129 F.4th at 1113 (cleaned up).

The standards for making out a federal claim for hostile work environment are demanding. *Fuller v. Fiber Glass Sys., LP*, 618 F.3d 858, 863 (8th Cir. 2010). The Supreme Court has "made it clear that conduct must be extreme to amount to a change in the terms and conditions of employment," as required by Title VII. *Al–Zubaidy v. TEK Indus., Inc.*, 406 F.3d 1030, 1038 (8th Cir. 2005) (quoting *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998)). While "any [sex]-based harassment in the workplace is unreasonable and may, in turn, have the effect of interfering with an employee's performance . . . there must be evidence that the harassment was sufficiently severe or pervasive to alter the conditions of her employment and create an abusive working environment." *Parker*, 129 F.4th at 1113 (cleaned up). "Assessing whether she has met this burden, [courts] look at the totality of the circumstances, including the frequency and severity of the discriminatory conduct, whether such conduct was physically threatening or humiliating, as opposed to a mere offensive utterance, and whether the conduct unreasonably interfered with [her] work performance." *Hairston*, 6 F.4th at 841 (internal quotation marks and citation omitted). "'[S]imple teasing,' offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the 'terms and conditions of employment.'" *Al–Zubaidy*, 406 F.3d at 1039 (quoting *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 82 (1998)).

The case at bar does not rise to the "pervasive sexual innuendo[s] and repetitive offensive touching" that the Eighth Circuit has found to be sufficient to establish a hostile work environment claim. *See Baker v. John Morrell & Co.*, 382 F.3d 816, 828 (8th Cir.

11

2004) (collecting cases). Here, Alexander has not pointed to evidence that would establish that there was pervasive sexual harassment in the form of comments or touching as there is only one alleged occurrence. Further, the Court does not find the June 11 incident—Mehta brushing his leg against Alexander's—to be sufficiently severe on its own. *See, e.g.*, *Hocevar v. Purdue Frederick Co.*, 223 F.3d 721, 738 (8th Cir. 2000) ("In addition, a few inappropriate comments and an unwanted slow dance do not amount to particularly severe conduct that was threatening or humiliating."); *Duncan v. General Motors Corp.,* 300 F.3d 928, 931–34 (8th Cir. 2002) (finding the plaintiff did not "clear the high threshold" of pervasive and severe even where her co-worker stroked her hand, expressed interest in having a relationship with her, requested she make a vulgar sketch, put up posters depicting the plaintiff as the president of the "Man Hater's Club of America," requested she draft the beliefs of "He-Men Women Hater's Club," required her to use a computer with a screen saver of a naked woman, kept a penis-shaped pacifier in his desk that he showed to the plaintiff, and forced her to go to a bar with him). "Simply put, [Alexander's] experiences—taken alone or together—fail to satisfy the demanding 'severe or pervasive' threshold necessary for a hostile work environment claim under Title VII . . . ." *Johnson v. U.S. Postal Serv.*, 2025 WL 752247, at *2 (8th Cir. Mar. 10, 2025).

As for the other alleged action, Alexander has failed to show any causal nexus between the actions and her sex. There is no evidenced connection between her sex and her being excluded from meetings, excluded from rotation as Acting Chief of Staff, receiving performance downgrades, or being talked down to. For these reasons, Alexander's hostile work environment theory fails as a matter of law.

## B. Retaliation for EEO Activity

Title VII prohibits an employer from discriminating against an employee "because [an employee] has opposed any practice made an unlawful employment practice by [Title VII]." 42 U.S.C. § 2000e–3(a). Again, the *McDonnell Douglas* burden shifting framework applies. To establish prima facie retaliation under Title VII, a plaintiff must show that: "(1) she engaged in protected conduct; (2) a reasonable employee would have found her employer's retaliatory action materially adverse; and (3) the materially adverse action was causally linked to her protected conduct." *Parker*, 129 F.4th at 1114 (citation and internal quotation marks omitted). Whether an action is materially adverse is "objective, requiring [courts] to consider whether a reasonable employee in the plaintiff's position might have been dissuaded from making a discrimination claim because of the employer's retaliatory actions." *Devin v. Schwan's Home Serv., Inc.*, 491 F.3d 778, 785 (8th Cir. 2007), *abrogated on other grounds by Torgerson v. City of Rochester*, 643 F.3d 1031 (8th Cir. 2011).

After some admitted truffle-hunting,[4] the Court has pieced together Alexander's side of the story: it appears she was effectively iced out by Mehta and Parks, denying her the career-building opportunity of serving as Acting Chief of Staff; removing her from the hiring panel; causing her to be excluded from meetings involving the running of her phlebotomy lab (which ultimately failed); having her concerns regarding COVID safety and general support ignored; delaying her evaluation which is used for assessing

---

[4] Though Alexander's briefing mentions only the exclusion from meetings and the rotation for serving as Acting Chief of Staff as retaliatory acts, her citations to the Additional Statement of Material Facts and the cited evidence therein offer several more alleged retaliatory actions. Doc. 39, p. 6; *see, e.g.*, Doc. 39-10, ¶ 5.

bonuses and other awards; and receiving a partially unsatisfactory evaluation despite no prior disciplinary actions, which Alexander asserts could result in loss of privileges, among other events. The evidence shows that Alexander was working with the EEO counselors and filed a complaint in April 2020, and that most of the conduct above occurred throughout that summer, particularly in June, and into the fall of that year. Alexander also stated that the other chiefs of departments—who had not made protected disclosures—did not face the same hostilities that she did.

A reasonable juror could find that these actions—when taken together and viewed in the light most favorable to Plaintiff—would dissuade a reasonable employee from making a discrimination claim and were causally linked to Alexander's EEO activity. Alexander has therefore met her initial burden under *McDonnell Douglas*. This shifts the burden to Defendants to present a legitimate, nonretaliatory reason for the actions. Defendants present a legitimate reason only for removing Alexander from the hiring panel: that the panel had been selected by the wrong person, and to correct this, "[a]gency management directed the appropriate official to remove the incorrectly assigned panel members and select the correct personnel." Doc. 37, p. 5; *see* Doc. 36-1 (Mehta's EEO testimony describing that the incorrect person had organized the panel when the initial invitation went out). The timing of the removal in the midst of Alexander's reporting to the EEOC and the June mediation with Mehta, as well as Alexander's evidence that the initial panel had been set up by the usual administrative personnel, who believed Alexander should have stayed on the panel based on his prior experience organizing such panels, create a genuine issue of material fact whether Defendants' explanation is pretextual. It does not appear that Defendants brief a legitimate reason for the remaining instances.

14

Therefore, there is a genuine issue of material fact whether Defendants retaliated against Alexander for her EEO activity, and the Title VII claim for retaliation survives.

### C.  Equal Pay Act

Alexander brings a claim for violation of the Equal Pay Act, 29 U.S.C. §§ 206(d), 215(a)(2), alleging that in November 2021 a male doctor was offered $500,000 for a staff pathologist position, in contrast to Alexander's salary of approximately $288,000 for Chief of Pathology. *See* Doc. 11, p. 19. According to Alexander, she reported this disparity and was retaliated against by being passed over for a direct hire position as Associate Chief of Staff for Ancillary Services in violation of 29 U.S.C. § 215(a)(3). *See id.* at pp. 20–21. The undisputed evidence in this case eliminates any viable EPA claim here.

To start, Alexander fails to establish a prima facie case under the EPA, which requires "an employee [to] prove an employer paid different wages to men and women performing equal work." *Drum v. Leeson Elec. Corp.*, 565 F.3d 1071, 1072 (8th Cir. 2009) (citation omitted). Here, Alexander admits that the male doctor was, in fact, offered only $282,000—less than her nearly $288,000. Further, Alexander admits that the male doctor was ultimately not even hired, and the position was instead given to a female doctor who was offered the same amount as the male doctor. Because there was no pay discrepancy, Alexander's claim for an EPA violation fails as a matter of law.

Alexander's claim for retaliation under the EPA, 29 U.S.C. § 215(a)(3), also fails because the asserted adverse action took place before the protected activity. Alexander medically retired in September 2021. In November 2021, she became aware of what she believed was an EPA violation. Then, in January 2022, she claims she was passed over for the position of Associate Chief of Staff of Ancillary Services—a position Alexander

15

concedes was never created. *Nine months later*, in September 2022, Alexander alleges she engaged in protected activity by reporting an EPA violation to the EEOC. *See* Doc. 11, ¶ 75. Even assuming all *allegations* are true—noting of course that Alexander is held to a higher burden at summary judgment—Defendants simply could not have retaliated against Alexander nine months *before* she engaged in protected conduct. Thus, the EPA retaliation claim fails as a matter of law.

### D. Whistleblower Protection Act

Finally, Alexander brings a claim under the Whistleblower Protect Act, 5 U.S.C. § 2302(b)(8), asserting that, in response to her filing EEOC complaints, informing the OIG of document destruction in the Lookback Project, and making complaints to the OIG regarding safety concerns at the mobile phlebotomy lab, Mehta took adverse employment actions against her by delaying her performance evaluation, giving her an unsatisfactory rating, and deliberately excluding her from bonuses that her male colleagues received. (Doc. 39, pp. 8–9). Defendants move for summary judgment on the basis that this Court is without jurisdiction because Alexander failed to exhaust her administrative remedies for a WPA claim. In response, Alexander argues that her WPA claim constitutes a "mixed case" with her discrimination claims and, therefore, did not require the typical administrative exhaustion before bringing it before this Court. While "mixed cases" have more procedural options, Alexander overstates the effect of those options in this case.

The WPA prohibits taking, failing to take, or threatening to take personnel action against an employee because of any disclosure of information that the employee reasonably believes is evidence of, *inter alia*, a violation of the law or a substantial and specific danger to public health or safety. 5 U.S.C. § 2302(b)(8). A person seeking

16

corrective action for a violation of the WPA must first seek such action from the Office of Special Counsel ("OSC"). 5 U.S.C. § 1214(a)(3). Once the OSC notifies the employee that the investigation has been terminated or once a certain amount of time has passed without such notification, the employee may seek corrective action from the Merit Systems Protection Board ("MSPB"). 5 U.S.C. §§ 1214(a)(3), 1221.

Section 7702(a)(1) gives the MSPB jurisdiction over "mixed cases"—those involving the assertion of civil-service rights under the Civil Service Reform Act ("CSRA") that are appealable to the MSPB and rights under federal antidiscrimination law. In such "mixed cases," the MSPB shall decide both the issue of discrimination and the appealable CSRA action. The Supreme Court has added further nuance to the meaning of a "mixed case" and the avenues for review. A "mixed case" is one in which "an employee complains of a personnel action serious enough to appeal to the MSPB *and* alleges that the action was based on discrimination." *Kloeckner v. Solis*, 568 U.S. 41, 44 (2012) (check emphasis). Special procedures apply in such cases "different from those used when the employee either challenges a serious personnel action under the CSRA alone or attacks a less serious action as discriminatory." *Id.* at 45. That is,

> A federal employee bringing a mixed case may proceed in a variety of ways. **She may first file a discrimination complaint with the agency itself**, much as an employee challenging a personnel practice not appealable to the MSPB could do. *See* 5 CFR § 1201.154(a); 29 CFR § 1614.302(b). If the agency decides **against her**, the employee may then either **take the matter to the MSPB** or **bypass further administrative review** by **suing the agency in district court**. *See* 5 CFR § 1201.154(b); 29 CFR § 1614.302(d)(1)(i). **Alternatively**, the employee may initiate the process by bringing her case **directly to the MSPB**, forgoing the agency's own system for evaluating discrimination charges. *See* 5 CFR § 1201.154(a); 29 CFR § 1614.302(b). If the MSPB upholds the personnel action (whether in the first instance or after the agency has done so), the employee again has a choice: She may **request additional administrative process**, this time

> **with the EEOC**, or else she **may seek judicial review**. *See* 5 U.S.C. §§ 7702(a)(3), (b); 5 CFR § 1201.161; 29 CFR § 1614.303.

*Kloeckner*, 568 U.S. at 45 (emphasis added); *see also Perry v. Merit Sys. Prot. Bd.*, 582 U.S. 420, 422–26 (2017). Alexander argues this is a mixed case because the alleged adverse actions taken in response to her alleged protected whistleblower activity also resulted from discrimination. *See* Doc. 39, pp. 7–9.

"Under the CSRA, 'exhaustion of administrative remedies is a jurisdictional prerequisite to suit.'" *Volmar v. Comm'r of Soc. Sec.*, 2023 WL 11797930, at *8 (E.D.N.Y. Sept. 30, 2023) (quoting *Chinniah v. Fed. Energy Regul. Comm'n*, 62 F.4th 700, 702 (2d Cir. 2023)). And while the case law reviewed by this Court sets forth various avenues for bringing a "mixed case"—including review by the agency's EEO office or the MSPB that may then be appealed to the district court without further administrative review—none of the cases provide an avenue for a district court to review a WPA claim in the first instance. Nevertheless, Alexander appears to argue that, in mixed cases, an employee need only exhaust the discrimination claim (not the WPA claim) before bringing both to the district court, thereby permitting an employee to bypass administrative review of the WPA claim altogether. The Court does not read the case law or statutes to say as much, particularly where the alleged adverse actions are relatively minor. *See Kloeckner*, 568 U.S. at 44 ("If (but only if) the action is particularly serious—involving, for example, a removal from employment or a reduction in grade or pay—the affected employee has a right to appeal the agency's decision to the MSPB, an independent adjudicator of federal employment disputes.").[5]

---

[5] At least one circuit court of appeals has held that "mixed cases" include only those personnel actions that are directly appealable to the MSPB, e.g., termination and

18

Here, the only attached EEO Complaint from January 29, 2021, makes no mention of whistleblowing activity, let alone any such activity regarding the phlebotomy lab or the Lookback Project, and Alexander points to no evidence that she brought a WPA claim before the EEO or the MSPB prior to raising it in this Court.[6] Though an EEO charge "need not specifically articulate the precise claim, it must nevertheless be sufficient to give the employer notice of the subject matter of the charge and identify generally the basis for a claim." *Humphries v. Pulaski Cty. Special Sch. Dist.*, 580 F.3d 688, 697 (8th Cir. 2009) (internal quotation marks and citation omitted)). "Construing the allegations in [Alexander's] Complaint liberally, the Court finds that the scope of the EEO[ ] investigation would not have included these allegations." *Boyd v. BJC Health Sys.*, 2018 WL 620484, at *4 (E.D. Mo. Jan. 29, 2018); *see also Shannon v. Ford Motor Co.*, 72 F.3d 678, 685 (8th Cir. 1996) ("[T]here is a difference between liberally reading a claim which lacks specificity . . . and inventing, *ex nihilo*, a claim which simply was not made." (internal quotation marks omitted)).

Alexander's EEO charge makes no mention of her whistleblower activity or reprisal for such, and her current WPA claim is not reasonably related to her charges of harassment and reprisal for EEO activity such that the WPA claims would have fallen

---

demotion. *Zachariasiewicz v. U.S. Dep't of Just.*, 48 F.4th 237, 243–44 (4th Cir. 2022) (citing 5 U.S.C. § 7512). Cases like the instant one, where the personnel action is more minor and would have to first go to the OSC before the MSPB, would not constitute a "mixed case" under *Zachariasiewicz*. Defendants ask the Court to adopt this holding. However, because the Court finds that, even assuming this is a "mixed case," Alexander failed to exhaust her WPA claim, it makes no further finding on whether an action must be directly appealable to the MSPB to constitute a mixed case.

[6] In Alexander's testimony during the VA's EEO investigation of her January 2021 charge, she discusses certain "whistleblowing activity." *See* Doc. 39-1. However, Alexander has not directed the Court to evidence that any whistleblowing claim was actually brought before these agencies such that they would be administratively exhausted.

within the scope of the EEO investigation. *Volmar v. Comm'r of Soc. Sec.*, 2023 WL 11797930, at *9 (E.D.N.Y. Sept. 30, 2023) ("A claim of exhaustion would have to rely on plaintiff's listing 'whistleblowing' alongside" other protected categories like race and sex, "[b]ut plaintiff goes on to provide a 'description of claim' summarizing his grievances without any mention of whistleblowing—asserting that . . . he was discriminated against [based on] . . . Sex (Male) . . . and Retaliation (Prior EEO activity)." (internal quotation marks and citations omitted)); *c.f. Boyd*, 2018 WL 620484, at *4 ("[T]he Court agrees that Plaintiff's allegations that [the defendant] discriminated against her on the basis of her race (African-American) and her disability (Iron Deficiency Anemia) are not 'like or related' to the charge of discrimination which mentioned only retaliation for being a whistleblower."). This is also evidenced by the EEO's "Claims Accepted for Investigation," which lists "hostile work environment based on sex (female), and reprisal (prior EEO activity)." (Doc. 39-1, p. 2). Accordingly, the WPA claim is dismissed for lack of jurisdiction.

### IV. CONCLUSION

**IT IS THEREFORE ORDERED** that the Motion for Summary Judgment is **GRANTED IN PART AND DENIED IN PART**. Alexander's claim for Title VII discrimination and her claims under the EPA and WPA are **DISMISSED WITH PREJUDICE**. Alexander's claim for Title VII retaliation survives.

**IT IS SO ORDERED** on this 27th day of May, 2025.

_____
TIMOTHY L. BROOKS
UNITED STATES DISTRICT JUDGE